FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 03 2012

JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

ROBERSON & ASSOCIATES INSURANCE,
REAL ESTATE & INVESTMENTS INC. d/b/a
ROBERSON & ASSOCIATES INSURANCE AND
CHURCH HOUSE INSURANCE AGENCY             PLAINTIFF

VS.                    CASE NO: 4-12-CV-0201 JMM

THE HANOVER INSURANCE COMPANY;
MASSACHUSETTS BAY INSURANCE COMPANY;
ALLMERICA FINANCIAL BENEFIT INSURANCE
COMPANY; and THE HANOVER AMERICAN
INSURANCE COMPANY                          DEFENDANTS

This case assigned to District Judge Moody
and to Magistrate Judge Volpe

## COMPLAINT

Plaintiffs for their Complaint state:

1. Plaintiff Roberson & Associates Insurance, Real Estate & Investments Inc. d/b/a Roberson & Associates Insurance and Church House Insurance Agency ("Roberson") is a corporation organized under and doing business pursuant to the laws of the State of Arkansas.

2. Defendants The Hanover Insurance Company, Massachusetts Bay Insurance Company, Allmerica Financial Benefit Insurance Company and the Hanover American Insurance Company (collectively referred to as "Hanover") are insurance corporations organized and existing under the laws of foreign states (New Hampshire, Massachusetts, Pennsylvania and New Hampshire, respectively) with their principal offices located in Worcester, MA. The corporations do business in and throughout the state of Arkansas, but none of the defendants are organized under the laws of the state of Arkansas.

3. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00. There is complete diversity among the parties. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. Section 1332.

4. This Court has personal jurisdiction over the parties and venue is proper with this Court.

5. On February 26, 2007, Roberson entered into an agency agreement with Hanover. Said agreement had an effective date of January 10, 2007. See attached hereto as exhibit "A" and incorporated herein by reference a copy of the Agency Agreement.

6. At the time of the initial agency agreement, Roberson and Hanover's agreement provided for Roberson to sell and service personal lines and commercial lines for Hanover.

7. In May 2007, Hanover recruited Roberson to become one of a few select agents to be part of "The Hanover's Religious Institutions Niche." Hanover promised Roberson that Hanover would give Roberson an "in house" rating system and quoting system so that Roberson could quickly and efficiently quote church related business and obtain that business. Hanover knew that one of the keys to obtaining new business in the insurance industry is to be able to give the customer a quote quickly and get them signed up quickly – before they go shop somewhere else.

8. Hanover represented to Roberson that Hanover had such a rating and quoting system in place and that they would provide that system to Roberson. In the mean time, Hanover promised to have a "niche" underwriter assigned to Roberson so that Roberson could obtain quotes and sell policies for church related business.

9. After a number of months passed by with no rating system being provided by Hanover, Roberson began pressuring Hanover to provide the system to Roberson. Each time that Roberson would ask about the rating and quoting system, Hanover would promise that Roberson would have it soon.

10. In reliance upon the promises of a rating and quoting system and the promise of having a "niche" underwriter assigned to Roberson, Roberson and its employees spent countless man hours recruiting and soliciting new business – church related business in particular. In further reliance upon Hanover's promises, Roberson also expended considerable sums of money for business cards, advertisement and other expenses building and developing church related business.

11. Roberson was successful in the recruiting of the church related business. In fact, beginning in 2007 and continuing through 2010, Roberson recruited hundreds of churches and church related business. Based on the promises and representations of Hanover, Roberson expected to receive the ratings and quote system any day. Unfortunately, each time Roberson recruited a new church related customer, Roberson would have to contact Hanover and ask for a quote, since Hanover had not yet provided the ratings system to Roberson.

12. The vast majority of the times that Roberson asked for a quote on a particular church related customer, Hanover failed to provide or refused to provide the requested quotes. The process worked like this: Roberson would spend substantial time and expense marketing and recruiting new customers, gathering up all of the customer's information and putting together a package for that customer's particular church related needs. Roberson would then provide that information to Hanover and ask for quote.

When Hanover would ask for a quote, one of the following would occur: i. Hanover would not respond at all; ii. Hanover would respond only to say that they were not willing to provide a quote; or iii. Hanover would respond and say they didn't have time to quote.

13. On a few occasions, Roberson learned that while Hanover refused to provide a quote for a particular customer for Roberson, Hanover had provided a quote on that very same customer to another agency – a competitor of Roberson.

14. For a three year period, Hanover only provided two quotes – even though Roberson has asked for quotes on hundreds of customers.

15. Many times from 2007 until 2010, Hanover promised that that Roberson would get an in house rating system for church related business and have the ability to turn a quote around in a matter of minutes.

16. On December 23, 2010, Robin Nicks, Regional President of Hanover, informed Roberson that she "is neither willing nor comfortable providing an 'in-house' online rating/issuance capability." This contradicted the previous promises made by Hanover and this was the first time that Roberson learned that they would not be provided with a rating system. This was the first time that Roberson realized that Hanover was not going to give Roberson an "in house" rating system.

17. In December 2011, Robin Nicks told Roberson that she "personally did not want Roberson to write any more church related business." This comment was a huge blow to Roberson because Roberson had spent the past few years marketing, recruiting and building its business around church related insurance sales – all in reliance upon the promises and representations made by Hanover. This was the first time that

Roberson realized that Hanover was not going to allow Roberson to sell church related policies.

18. When Roberson pressed Hanover about their failure to quote church related business and refusal to allow Roberson to sell church related policies, the employee from Hanover told Roberson that "if a tornado were to come through town and there was a gas station and a church side by side, the tornado would destroy the church first."

19. As of the present date, Hanover has never provided the rating system and quoting system to Roberson. Further, Hanover has never provided proof that any such system ever existed. Based upon this, Roberson believes that Hanover's representation that it had a ratings system to provide to its agents was false. Further, Hanover's representation that they would provide an in house rating system to Roberson was false, as demonstrated by the conduct and subsequent statements of Hanover.

## COUNT I – BREACH OF CONTRACT

20. Hanover's failure and refusal to provide an in house rating system and to provide quotes to Roberson on church related business constitutes a breach of contract.

21. As a result of Hanover's breach, Roberson sustained damages in the form of lost profits related to lost premiums and commissions on those premiums that it would have earned had Hanover provided the requested quotes. Further, Roberson sustained damages in the form of expenses relating to man hours, marketing materials and employee compensation and other expense relating to the marketing and recruitment of customers for church related business.

22. Roberson's damages exceed the minimum amount required for diversity of citizenship jurisdiction in federal court in a specific amount to be determined at trial.

## COUNT II – FRAUD

23. Hanover represented that it had an existing rating and quoting system in place to allow Roberson to quickly and efficiently quote church related business. Hanover further represented that it would provide Roberson with an "in house" rating system. These representations were false.

24. Roberson relied on said represetentions in expending considerable sums of money on man hours, marketing materials and employee compensation and other expense relating to the marketing and recruitment of customers for church related business.

25. As a result of Hanover's fraud, Roberson has sustained damages in the form of expenses relating to man hours, marketing materials and employee compensation and other expense relating to the marketing and recruitment of customers for church related business and lost profits for premium and commission that it would have earned but for defendant's fraud.

26. Roberson's damages exceed the minimum amount required for diversity of citizenship jurisdiction in federal court in a specific amount to be determined at trial.

27. Roberson is entitled to and hereby seeks an award of punitive damages from Hanover related to defendants' intentional and fraudulent conduct. Plaintiff seeks an amount of punitive damages sufficient to punish the defendants and to deter defendants from any similar conduct in the future.

## COUNT III – PROMISSORY ESTOPPEL

28. Plaintiffs claim damages from Defendant based upon promissory estoppel. Defendant actively recruited Roberson to be an agent that targeted and worked hard to recruit church related business.

29. Defendants promised plaintiff that it would provide plaintiff with an in house ratings system and that, in the interim, it would provide quotes to Roberson for its customers on church related business.

30. Defendants should reasonably have expected Roberson to act in reliance on Defendant's promise.

31. Roberson reasonably relied upon Hanover's promise to its detriment by expending considerable sums of money on man hours, marketing materials and employee compensation and other expense relating to the marketing and recruitment of customers for church related business.

32. As a result of Defendants' refusal to provide the in house rating system and refusal to provide quotes to customers of Roberson, Roberson has been damaged in the form of expenses relating to man hours, marketing materials and employee compensation and other expense relating to the marketing and recruitment of customers for church related business and lost profits for premium and commission that it would have earned but for defendant's failure to keep its promises.

33. Roberson's damages exceed the minimum amount required for diversity of citizenship jurisdiction in federal court in a specific amount to be determined at trial.

34. Injustice can only be avoided by enforcement of Defendants' promise or by requiring defendants to pay the damages that resulted from their failure to keep their promises.

35. The Plaintiff is entitled to and hereby seeks a judgment of and from defendants, jointly and severally, in an amount to be determined at trial in excess of the minimum amount required for diversity of citizenship jurisdiction in federal court, plus pre and post-judgment interest.

36. Plaintiff is entitled to and hereby seek an award of attorney fees and court costs related to the breach of contract action.

37. Plaintiff demands trial by jury.

WHEREFORE, Plaintiff moves and prays that they be awarded judgment of and from the Defendants, jointly and severally, in an amount to be determined at trial in excess of the minimum amount required for diversity of citizenship jurisdiction in federal court; for pre and post judgment interest; for court costs and attorney's fees; and for all other just and proper relief to which it is entitled.

RESPECTFULLY SUBMITTED:

By:_____
Danny R. Crabtree (2004006)
Attorney at Law
114 South Pulaski Street
Little Rock, AR 72201
501-372-0080
Danny.crabtree@sbcglobal.net

Timothy O. Dudley (82055)
Attorney at Law
114 South Pulaski Street
Little Rock, AR 72201
501-372-0080
Todudley@swbell.net



February 2, 2007

Mr. Del Roberson
Roberson & Associates Insurance
315 North Market
Benton, AR  72015

Dear Mr. Roberson:

Welcome!  We are excited to be able to have the opportunity to work with Roberson & Associates Insurance.  This letter is intended to provide you with the details necessary to get our new partnership off to a "Flying Start".

To assist in getting you started, our Agency Licensing and Appointment Team have authorized you to sell our products in the following underwriting companies:

**The Hanover Insurance Company**
**Massachusetts Bay Insurance Company**
**Allmerica Financial Benefit Insurance Company**
**The Hanover American Insurance Company**

Allowing appointments in the following state: **Arkansas**

Your agency has been assigned the following code: **7708269**

Please contact the Agency Licensing and Appointment Team at 1-800-322-9033 if the above information requires changes and/or updates.

Our password protected site, The Agency Place (TAP) provides our Agencies with one stop shopping where you can access information on your customers' policies, claims and billing data, and reports.  In addition, you can view and print our Personal Lines and Commercial Lines underwriting manuals and guidelines via TAP.  Just click onto our website address https://tap.hanover.com to get started.  Please, be sure to sign on to this site before saving as a favorite.  If your agency provided us with information to send transactions via download, the IBM, NAIC and coverage code information can be found on TAP, under the resource library/agency automation section.

Your Principal Master User ID is **ROBFG0PM** and Password is **hancit1**. This ID will access your monthly agency reports including Production, Loss, and Commissions.  Once in, please click on the "New Agents Resource Center" that was designed specifically to navigate you through our site.  Located under the resource center is a link for desktop support.  It contains important information on our system requirements.  For optimum system performance, we recommend checking your system settings.  Our Point of Sale quoting system can also be accessed once you are in TAP.  If you have any questions regarding access to TAP or POS, please call our ACA helpline at 1-800-225-2032.

A User ID and password has been created for the following individuals:

(User ID and passwords are NOT case sensitive)

| **Name** | **User Id** | **Password** |
|---|---|---|
| Jeffrey Cook | ROBFG001 | hanover1 |
| Sherry Garnett | ROBFG002 | hanover1 |
| Sheila O'Keane | ROBFG003 | hanover1 |

440 Lincoln Street ■ Worcester, MA 01653    Phone | 508 - 853 - 7200    Fax | 508 - 853 - 6332
The Hanover Insurance Company | Citizens Insurance Company of America

www.Hanover.com



| | | |
|---|---|---|
| Jacqueline Roberson | ROBFG004 | hanover1 |
| hn Rominie | ROBFG005 | hanover1 |
| ..ancy Walker-Jackson | ROBFG006 | hanover1 |
| CSR#1 | ROBFG007 | hanover1 |

We recognize the system is new to you and are offering training sessions for TAP and POS – Quoting and Issuing Business. Your Agency Automation Consultant, Mary Middleton, will contact you to set up a training schedule that is convenient for you. If you would like to contact Mary, in the meantime or if you have questions regarding TAP or POS, she can be reached at 504-416-4452 or email her at mmiddleton@hanover.com.

A welcome kit will be mailed to your office that contains the following documents:

- Agency Agreement
- Schedule of Authority
- Personal Lines Schedule of Commissions
- Commercial Lines Schedule of Commissions
- Bonus Plus Plan Agreement
- Flying Start Partner Program Agreement
- Hanover Plaque

We look forward to building a strong and profitable partnership and are committed to providing your customers with outstanding service and excellent products.

Sincerely,

*Melanie Schutrick*

Melanie Schutrick
Licensing Consultant
Agency Licensing Services

Cc: Herb Swartz
Chuck Foura
Rick Farmer
Colin Campbell
Amy Tressler
Coral Rogers
Mary Middleton



**The Hanover Insurance Group**

The Hanover Insurance Company | 440 Lincoln Street, Worcester, MA 01653
Citizens Insurance Company of America | 645 West Grand River Avenue, Howell, MI 48843

**Schedule of Authority**

This SCHEDULE OF AUTHORITY (this "Schedule") dated this __10__ day of __January__, 20__07__ is attached to and made a part of the Agency Agreement between __Roberson & Assoc. Ins.__ (the "Agent") and the company(ies) designated in Section 1 below (which company(ies) may hereinafter individually and collectively be referred to as the "Company") dated __January 10__, 20__07__ (the "Agency Agreement"). The terms "you" and "your" mean the Agent; the terms "we," "us" and "our" mean the Company.

1. By signing the Agency Agreement you become an Agent for the following companies:

   [X] The Hanover Insurance Company  
   [X] Massachusetts Bay Insurance Company  
   [X] Allmerica Financial Benefit Insurance Company  
   [X] The Hanover American Insurance Company  
   [ ] Hanover Lloyds Insurance Company  

   [ ] Citizens Insurance Company of America  
   [ ] Citizens Insurance Company of Ohio  
   [ ] Citizens Insurance Company of Illinois  
   [ ] Citizens Insurance Company of the Midwest  
   [ ] Allmerica Financial Alliance Insurance Company  

   Exceptions and Restrictions:

2. As an Agent for the Company, you may act as a representative of the Company in negotiating, servicing or effecting policies of insurance issued in the name of the Company for the following lines of business:

   [X] Personal Lines  
   [X] Commercial Lines  
   [ ] Fidelity and Surety Bonds  
   [X] Other (Specify) __Marine__  

   Exceptions and Restrictions:

3. As an Agent for the Company, you may act as a representative of the Company in negotiating, servicing or effecting policies of insurance issued in the name of the Company in the following states(s)/jurisdiction(s):

   Arkansas

   Exceptions and Restrictions:

Agent: Roberson & Associates Insurance  
By: _[signature]_  
Title: PRESIDENT, Owner  

Company: _[signature: Robin Nicks]_  
By: Robin Nicks  
Title: Regional President  

111-3149 (8/04)

 The Hanover Insurance Company | 440 Lincoln Street, Worcester, MA 01653
Citizens Insurance Company of America | 645 West Grand River Avenue, Howell, MI 48843

**Agency Agreement**

Name of Agent  Roberson & Assoc. Ins.

Address of Agent  315 N. Market Benton, AR 72015

Agency Code  7708269

THIS AGREEMENT (this "Agreement") is between the Agent indicated above and the company or companies designated on the schedule attached to and made a part of this Agreement (the "Schedule of Authority"), which company(ies) may hereinafter individually and collectively be referred to as the "Company." The terms "you" and "your" mean the Agent; the terms "we," "us" and "our" mean the Company.

When used in this Agreement, the term "Agent" means the above named person or business entity duly licensed to act as a representative of the Company, directly or through legally authorized personnel, in negotiating, servicing or effecting policies of insurance issued in the name of the Company. However, you are not our Agent with respect to insurance exposures you place with us through residual markets, including, but not limited to, automobile insurance placement facilities and pools, and workers' compensation placement facilities and pools. Rather, you are an agent of the insured or applicant with respect to such business.

## SECTION 1: EFFECTIVE DATE, TERM, AND AUTHORITY.

1.1  **Effective Date and Term.** This Agreement is effective on 1/10/07 and will continue in full force and effect until terminated by either party in accordance with Section 10 of this Agreement. Except as otherwise specifically provided in this Agreement, this Agreement shall be modified and/or amended only by an amendment or addendum signed by you and us.

1.2  **Your Authority.** On the effective date of this Agreement, you become an Agent of the Company with authority to solicit, bind, issue and deliver policies of insurance that we are licensed to write for the product line(s) designated in the Schedule of Authority and for which a commission rate is specifically listed in the Schedule of Commissions attached to and made a part of this Agreement.

1.3  **Limitations on Your Authority.** Your authority is limited by:

   a. Our underwriting rules and practices which we communicate to you and which may change from time to time. Such changes do not constitute "amendments" and are therefore not subject to Section 13 of this Agreement. We shall keep you informed of any changes by bulletins, documents and other notices as we may transmit to you from time to time. As a result of changes in our business plan, and subject to applicable law, we may choose to suspend, limit or cease writing certain lines, classes or groups of business.

   b. The terms, conditions and provisions set forth in this Agreement and in any schedules, addenda and amendments attached to and made part of this Agreement.

1.4  **Failure to Adhere to Limitations.** Upon written notice to you, your authority to solicit, bind, issue and/or deliver policies of insurance may be limited, suspended, or terminated by us at any time, and for any length of time, if you fail to adhere to the limitations set forth above in 1.3 of this section.

## SECTION 2: CONDUCT OF THE BUSINESS.

2.1  **Keep Us Informed.** You are responsible for sending us all evidence of insurance and for reporting on all insurance accepted and bound in our name within three (3) working days after the effective date. You are also responsible for notifying us of any additional information you acquire that, to the best of your knowledge, affects the rating of the risk.

2.2  **Inspection of Records.** All of your records and files pertaining to our business must be available to us for inspection by our representatives at any reasonable time. All of our records and files pertaining to your business will be available to you for your inspection at any reasonable time.

2.3  **Company Property.** All policies, powers of attorney, company seals and all other supplies, manuals and forms we provide to you remain our property. You will return our property promptly upon our request.

2.4  **Claims Reporting.** You will report all claims to us promptly and in accordance with such of our procedures as we communicate to you.

2.5 **Changes at Your Agency.** You will give us prior written notice of any changes in the form of legal entity under which you do business prior to making the change. Changes include mergers, adding or changing owners and/or selling or transferring your business. You will also give us prior written notice of any change in your agency name. Consistent with Section 10 of this Agreement, your failure to obtain our agreement to certain changes at your agency may be grounds for terminating this Agreement.

2.6 **Other Locations.** You are not permitted to make our products available to agents or producers doing business from locations other than your principal office without our prior written consent. Using branch or affiliated agency locations to sell or service our products requires our prior written consent.

2.7 **Return of Premiums.** You are responsible for the prompt delivery to policyholders of all dividends and return premiums entrusted to you.

2.8 **Compliance.** You are responsible for complying with all laws, rules, regulations and other requirements affecting your business, including, without limitation, any licensing, privacy and disclosure requirements.

2.9 **Independent Contractor Status.** You are an independent contractor, not our employee, and you are expected to exercise your own judgment and discretion in the conduct of your business, subject to the terms of this Agreement and the requirements of law.

2.10 **Fiduciary Responsibilities.** All premiums and/or other monies paid to you or collected by you in connection with our policies ("Funds") are our property. Commissions, if any, payable out of such Funds are debts we owe you. You are our fiduciary and you will hold any and all such Funds in your fiduciary capacity. You are responsible for maintaining and providing to us an accurate accounting of all such Funds and to pay on a timely basis all Funds due to us in accordance with this Agreement.

2.11 **Document Retention.** You will abide by our rules and procedures as may be established and communicated to you in writing for document retention. Documents, including the following, must be readily available for our inspection:

   a. Applications and any forms requiring an insured's signature,

   b. Forms or documentation mandated by regulatory authorities, and

   c. Coverage selection forms.

2.12 **Professional Liability Insurance.** You will maintain professional liability insurance with limits of liability not less than $1,000,000 per claim and not less than $1,000,000 annual aggregate. You will provide us with a certificate of insurance reasonably specifying that the aforesaid insurance is in effect, within fourteen (14) days of execution of this Agreement and at any other time when requested by us.

2.13 **Checks and Drafts.** In the event we allow you to participate in any program by which you are authorized to issue checks and/or drafts on our behalf, including, without limitation, checks or drafts for the payment or settlement of claims, then you agree to comply with such rules and procedures that we may establish from time to time and communicate in writing to you in connection with the any such program, and you will be responsible and liable for any use or misuse of any check or draft stock by you, your agents, servants, employees and/or other person(s) or entity(ies) under your authority or control.

**SECTION 3: COMPANY SYSTEMS & NETWORK ACCESS.**

If we grant you access to our computer systems, software, and network offerings ("Network"), you agree to use the Network and to reasonably maximize its use and also agree to the following terms, conditions, rules and procedures, as we may establish or change from time to time:

3.1 **Adherence to Guidelines.** When using the Network to enter new business, policy changes, or other information about coverages or insureds, you will comply with all our guidelines and adhere to restrictions on binding authority.

3.2 **Data Integrity.** You will make every reasonable effort to assure that:

   a. Data is entered correctly,

   b. Errors are corrected promptly upon discovery, and

   c. We are notified of errors whenever appropriate.

3.3 **Confidentiality.** You may gain access via the Network to information and programs considered proprietary and confidential. We consider all Network information confidential; access is restricted to those designated to perform our business. You will abide by rules and procedures to protect such information and programs. As used herein, the term "Network information" shall not be construed to include your expirations, as described in **Sections 5.3 and 6.1.**

3.4 **Access.** You assume responsibility for any use made of the Network and will take measures to protect the confidentiality of access codes, passwords, user IDs, or other access methods. You will not permit anyone to have access to the Network, directly or indirectly, except those persons who have been designated by you and us. Failure to restrict access may constitute a material breach of this Agreement.

3.5 **Access Limitations.** We reserve the right to modify, limit, or eliminate your access to the Network or any of the Network's features at any time, for any reason.

3.6 **Notification of Unauthorized Use.** You will notify us immediately if you become aware of any unauthorized use of or access to the Network.

3.7 **Termination Requirements.** Upon termination of this Agreement, your obligation to maintain the confidentiality of our proprietary information survives termination. In addition, you are obligated to cease use of and remove or erase all programs and software we provide you from your computer systems and/or return them to us, at our discretion.

Upon notice of termination, we may choose to allow you to retain Network access in order to process changes to inforce policies. Any such access shall continue to be governed by this Section 3, notwithstanding any termination of this Agreement, and nothing contained herein shall limit

a. our right to terminate your access in the event that we reasonably believe that you are engaged in serious misconduct, including but not limited to fraudulent acts, or

b. any requirement we may have to reasonably cooperate with you in order to allow you to service the business you have with us.

3.8 **Use of Network.** We shall pay all Network traffic charges associated with use of the Network for interface with us.

3.9 **Equipment/Software.** You agree to purchase, lease or otherwise provide equipment reasonably suited for the electronic processing of our transactions. You will also pay for and provide the phone line required for interface configuration including, but not limited to, monthly service fees, installation costs and maintenance charges.

You are responsible for any and all expenses associated with hardware and software necessary for download and upload, including data transmission media (cable lines, satellite equipment, etc.) support, Internet access, maintenance, upgrades and training. When applicable, you will make a commercially reasonable effort to upgrade to the latest version of agency management system software within a reasonable amount of time.

3.10 **Initial Database Load.** We shall provide, at your request, an initial database load to your agency management system vendor. You are responsible for costs associated with the initial database load as made by vendors.

3.11 **Daily Download.** You will retrieve electronic transactions on a regular basis, preferably daily, but in no event less than four times each week. You will immediately notify us of any problems in retrieving downloaded policy information.

3.12 **Daily Upload.** You will upload electronic transactions on a regular basis, preferably daily, but in no event less than four times each week, when there are business transactions to be uploaded. You will immediately notify us of any problem encountered in uploading the policy information.

3.13 **Data Integrity Liability.** In the case of both downloads and uploads, we shall not be responsible for data corrupted due to media transfer or reformatting performed by you or your vendor. If data is transferred or accessed via the Internet, and/or such other on-line medium as may be applicable, you accept, at your own risk, that the Internet, and/or such other on-line medium as may be applicable, may not perform as intended, and that transmission of information on-line, over the Internet, or via electronic means may be insecure, unstable and/or unreliable. We shall not be responsible or liable for any damages, claims, losses or expenses arising out of or in connection with the foregoing, even if we have been advised of the possibility of such damages, claims, losses or expenses.

3.14 **Compliance with Agreements.** In the event that we may provide you with hardware, software, or services which are subject to or governed by licenses, contracts or similar agreements between us and a third party, you will abide by the terms and conditions of such licenses, contracts or similar agreements which are communicated to you.

**SECTION 4: COMPENSATION.**

4.1 **Commissions.** You are entitled to commission on premiums paid to us at the commission rate indicated in our Schedule of Commissions. You do not earn commission on premium adjustments of retrospectively rated policies.

4.2 **Notice of Changes.** We shall communicate any change in the Schedule of Commissions to you in writing with at least ninety (90) days' advance written notice.

4.3 **Implementation of Change.** A change in the rate of commission will be applicable to all insurance policies issued or renewed on or after the effective date of such change. For policies that are continuous or do not expire at least annually, the change will be applicable on the next anniversary date of the insurance policy occurring on or after the effective date of change.

4.4 **Rate Change Frequency.** We shall not change any rate of commission more than once in a twelve (12) month period, except:

    a   To comply with a statute or regulation, or

    b.  When you and we mutually agree in writing to the change.

4.5 **Refunds.** When we refund premiums, you will refund commissions to us at the same rate that they were allowed to you. This is true whether the transaction takes place during the term of this Agreement or after it terminates.

4.6 **Accounts Referred to Us for Collection.** We shall not pay commission on accounts you turn over to us for collection.

**SECTION 5: PREMIUM COLLECTION.**

5.1 **Agency Billed Policies.** Whenever Agency Billing procedures are used:

    a. You are responsible for collecting and remitting all premiums due to us, including any premiums resulting from interim and final audits. You are authorized to retain, out of premiums you collect, commissions in accordance with the Schedule of Commissions as full compensation for your services in connection with production and service of insurance placed with us. If you fail to pay us, in accordance with this Agreement, any or all premiums due to us, we reserve the right to apply any and all monies payable to you, including direct bill commissions and profit sharing awards, against such outstanding balance.

    b. We shall send you a monthly statement of premiums, unless, with our written consent, you will generate the same, not later than the fifteenth (15th) day of the next month.

    c. You will pay the money due in the statement to us, so that balances are received on or before the forty-fifth (45th) day following the last day of the month of the statement, whether or not you collect such payments from the policyholder. The omission of any item from the monthly statement does not relieve you of the responsibility to account for and pay all premiums due, nor does it prejudice the right of either party to collect any premiums due.

        (1) **Exception:** We shall undertake collection of additional policy premiums developed by final audit if, by written request, you turn the account over to us within forty-five (45) days of the initial billing date following your good faith effort to collect the premium.

        (2) **Exception:** We shall undertake collection of renewal premiums, only on non-cancelable bonds, at your written request, if such premiums are not paid within seventy-five (75) days of the initial date of billing following your good faith effort to collect the premium.

    d. If you fail to collect any premiums in accordance with the terms of this Agreement, we shall have the right to collect such premiums in any manner we see fit. Such action does not relieve you of your liability under this Agreement to pay us all other premiums. No commissions are paid on agency-billed premium we collect.

5.2 **Company Billed Policies.** Whenever Company Billing procedures are used:

    a. Unless we specify otherwise in writing, all applications and policies you submit must be accompanied by the initial premium owed to us without any deduction for commission.

    b. We shall pay commissions to you within fifteen (15) days after the last day of the commission month in which we receive and record applicable premiums as paid.

    c. We shall identify you as the Agent on all pertinent policies, premium notices, renewal certificates and cancellation notices.

    d. If this Agreement is terminated and you are in compliance with all its terms and conditions, we shall furnish you, upon written request, a complete list of your current policyholders and associated policy expiration dates.

5.3 **Remedies.** If you are delinquent in either accounting or payment, or have reporting discrepancies concerning any Funds due to us, we reserve the right to take any actions set forth in this Agreement, as well as any actions allowed by law, including, but not limited to, any of the following:

    a. Require automatic monthly payment of all agency billed policies based on our then current electronic funds transfer methods. You agree to sign and deliver to us all necessary documents to initiate such payments. You agree to maintain adequate funds in your bank account for all premiums owed to us.

    b. Require you to participate in a rehabilitation program.

    c. Upon written notice to you, suspend your authority to bind or write any new business or to increase our liability, exposure, or risk or to extend the term of any policy without our prior written consent.

    d. At our discretion, retain as our property all expirations, and all right, title and interest in and to the records thereof applicable to business you have written with us, in the event that you have failed to pay us.

4

e. Suspend or terminate this Agreement immediately.

5.4 **Commissions.** We may offset commissions, or profit sharing awards, or other amounts we owe you, to the extent you owe us any Funds. If this Agreement is terminated due to non-payment of balances due, all reasonable and necessary legal fees and court costs we incur to successfully collect the amounts owed may be added to and become part of your indebtedness to us.

## SECTION 6: OWNERSHIP OF BUSINESS.

6.1 **Expirations.** Provided you have paid and continue to pay, on a timely basis, all Funds due to us in accordance with this Agreement, the ownership, use and control of all expirations, and all records applicable to business you have written with us, including your work product, shall be your exclusive property and shall be left in your undisputed possession and control, and we will not use our records of those expirations or work product in any marketing method for the sale or renewal of any form of insurance coverage or other product which abridges your right of exclusive ownership, use and control of such expirations and work product, nor shall we refer to or communicate this expiration information or work product to any other party.

6.2 **Agent of Record Change by Policyholder.** Except as provided in this subsection, we shall not knowingly take any action that could be construed as moving a policy from your agency to another agency without the written direction of the policyholder. To the extent required by law, we will notify policyholders of their rights to have an insurance policy renewed (whether directly or through another agency) following termination of this Agreement. You and we agree that such notice does not violate this Agreement.

6.3 **Failure to Pay Us.** If you have not properly accounted for and paid all Funds you owe us, you lose all of your rights to the expirations and all records applicable to business you have written with us. Those expirations and records and all right, title and interest therein will vest in us and become our property and shall be turned over to us on demand, and we shall have the sole right to use and control them unless you provide other security acceptable to us. Furthermore, you will not assign or otherwise transfer our security interest without our consent. If we assume control of such expirations and records, we may, at our discretion, choose to keep all commissions payable on the policies and apply them against what you owe us and/or sell such expirations and records, at public or private sale. If we do not recover enough to pay off what you owe us, you are still responsible for the amount that remains unpaid. If the amount we recover is more than you owe us, we shall deduct our expenses and pay any remaining balance to you.

## SECTION 7: INDEMNIFICATION.

We shall defend and indemnify you against civil and administrative liability imposed on you by law, including reasonable costs of defense and settlement, caused by our acts or omissions (including, but not limited to, liability imposed upon you under any federal or state Fair Credit Reporting Act or state Privacy Act arising out of your use of our insurance scoring system), except to the extent that you have breached this Agreement or otherwise caused or contributed to such liability by your own acts or omissions. You agree, as a condition to such indemnification, to notify us promptly of any claim or suit against you and to reasonably cooperate with us with respect to the investigation, settlement and/or defense thereof.

## SECTION 8: TREATMENT OF PRIVATE AND CONFIDENTIAL INFORMATION.

8.1 **Private Information.** Both you and we have obligations to safeguard customer information under Public Law No. 106-102 (the Gramm-Leach-Bliley Act) and other federal and state privacy laws and regulations (herein collectively referred to as "Privacy Laws"). In accordance with those Privacy Laws, you and we agree to comply with the Privacy Laws and agree further not to take any action to cause the other party to violate such Privacy Laws. If the applicable Privacy Laws change, each party shall take such action as is necessary to comply.

8.2 **Confidential Information.** As used in this Agreement, the term "Confidential Information" shall mean any non-public information that the disclosing party designates as confidential, or which, under the circumstances, ought to be treated as confidential. Confidential Information may be in any tangible form, including without limitation written or printed text or documents, audio or video tapes, CDs/DVDs or disks, computer disks or tapes or similar media, whether in machine readable or user readable form. Confidential Information shall not include information that was known to the receiving party prior to disclosure by the disclosing party; is or becomes available to the public through no breach of this Agreement; is received from a third party free to disclose such information without restriction; or is independently developed without the use of Confidential Information. Confidential Information shall include any information relating directly or indirectly to the marketing or promotion of our products, our released or unreleased software or other programs, our trade secrets and our proprietary information, including, but not limited to, technical and financial data, security information (such as computer passwords and identification codes) or information concerning our computer systems (such as codes and any operating instructions for our computer systems), and our business policies and/or practices.

8.3 **Agent's Responsibilities.** You agree not to disclose to third parties, without our prior written consent, any of our Confidential Information. Your agreement and obligation to safeguard the confidentiality of such Confidential Information will survive the termination of this Agreement.

8.4 **Company's Responsibilities.** We agree not to disclose to third parties, without your prior written consent, any of your Confidential Information. Our agreement and obligation to safeguard the confidentiality of such information will survive the termination of this Agreement.

8.5 **Required Disclosure.** If either party to this Agreement is required to disclose any Confidential Information of the other party pursuant to any federal, state or local law, statute, ordinance, regulation or other enactment, or the order of any judicial authority, then the party requested or required to disclose Confidential Information shall:

   a. use its best efforts and exercise all rights available to maintain the confidentiality of the Confidential Information, and

   b. promptly notify the other party in writing of such request or requirement so as to allow the other party to seek appropriate protective relief from all or part of such request or requirement. If such relief is not obtained, then the party requested or required to disclose Confidential Information may disclose that portion of the Confidential Information which it is compelled to disclose.

8.6 **Remedies.** In the event of any breach or threatened breach of the covenants, agreements and/or conditions contained in this Section 8, the party whose Confidential Information is at risk shall be entitled to an injunction and/or other equitable remedy or remedies prohibiting such breach in addition to any other remedies available in connection with such breach. The parties hereby acknowledge and agree that Confidential Information is valuable, proprietary and unique and that any disclosure of such Confidential Information in breach of this Agreement shall result in irreparable harm which cannot be adequately compensated by monetary damages alone.

**SECTION 9: SUSPENSION.**

At our discretion and upon written notice to you, we may suspend or modify all or part of the authority we have granted to you under this Agreement immediately for any of several reasons, including but not limited to:

9.1 **Failure to Pay.** You fail to pay any amount due to us on time.

9.2 **Breach of Agreement.** You are in breach of any obligation under this Agreement.

**SECTION 10: TERMINATION.**

10.1 **Termination Methods.** This Agreement may be terminated pursuant to any of the following (the effective date of any such termination being the "Termination Date"):

   a. **Upon Mutual Agreement.** You and we may terminate this Agreement any time by mutual written agreement.

   b. **After a Notice Period.** Either party may terminate this Agreement by giving the other party at least ninety (90) days' advance written notice.

   c. **Immediately for Certain Reasons.** We may terminate this Agreement immediately for any reason listed below:

   (1) If you lose your license or certificate of authority,

   (2) For any reason stipulated or not prohibited by law,

   (3) If you sell or transfer over fifty (50) percent of your business with us as measured by premium volume or policy count,

   (4) If you change the form of legal entity under which you do business, merge, add or change owners, or sell or transfer your business, unless we are notified promptly by you prior to such an event and we consent in writing,

   (5) For fraud, material misrepresentation, insolvency, bankruptcy, assignment for the benefit of creditors, abandonment, willful misconduct or abuse of authority,

   (6) If you fail to pay any amount due to us on time,

   (7) If you fail to comply with any of the provisions of this Agreement,

   (8) For breach of your duties under Section 5, the "Premium Collection" section, of this Agreement, or

   (9) If you receive compensation or any form of valuable consideration from a claims-related service provider in exchange for referral of any claimant of ours. Examples of claims-related service providers include, but are not limited to:

   - Public adjusters
   - Auto body repair shops or related businesses
   - Medical professionals
   - Legal professionals

10.2 **Impact Upon Authority.** Upon notice of termination from us, the following will apply:

   a. **No Authority.** Your authority to issue claims drafts, bind any new risk, or add insurance or increase limits on existing policies without our prior written approval ceases.

   b. **Service of Inforce Business.** Your authority with respect to policies remaining in force after termination of this Agreement is limited to servicing your business with us and making routine changes in policies which do not extend expiration dates or increase our liability, exposure or risk except with our written consent.

10.3 **Impact on Inforce Business.**

   a. **Continuation of Inforce Business.** All policies of insurance which are in force on the Termination Date may continue in force until their respective expiration dates or, in the case of policies of insurance having no expiration date or a policy term greater than one (1) year, until the next anniversary date of such policies. We shall have the right to cancel any such policies of insurance for underwriting reasons or for nonpayment of premiums, subject to applicable law and policy provisions.

   b. **Limits on Renewal.** If we are required by law to renew policies in force on the Termination Date, we shall do so, but only for the legally stipulated period, subject to the following conditions:

      (1) You will use your best efforts, consistent with applicable law, to replace all policies we issued pursuant to this Agreement with policies of other insurers.

      (2) We reserve all rights to cancel policies continued in force or renewed for non-payment of premium, underwriting reasons, or other reasons permitted by law.

      (3) We shall not be obligated under this section to renew policies for a class of business, line of insurance, product, coverage or limit which we cease or limit writing independent from your termination.

   c. **Accounting and Policy Billing.** We shall have the right to change the method(s) of accounting and/or billing between you and us, subject to applicable law and policy provisions.

   d. **Notice of Non-renewal.** Following termination of this Agreement, we shall send appropriate non-renewal notices to policyholders, subject to any requirements imposed by law or applicable policy terms.

10.4 **Impact Upon Commissions.** For policies renewed within six (6) months after the Termination Date, we shall pay commissions at the rates in effect immediately prior to termination or the prevailing rate at the time of renewal, whichever is less. For any policies renewed more than six (6) months after the Termination Date, we shall not pay any commissions unless required to do so by law.

10.5 **Return of Company Property.** Unless we instruct you in writing otherwise, you are required to promptly return all property belonging to us, including without limitation all policies, all powers of attorney, company seals, certification stamps, software, hardware, and all other supplies, manuals and forms.

10.6 **All Other Rights.** All other rights and obligations set forth in this Agreement will continue until the expiration of the last outstanding policy you placed with us or until otherwise terminated in accordance with this Agreement, except to the extent they are inconsistent with:

   a. The termination of your authority to solicit and issue policies,

   b. The termination of your authority to make changes in policies that would extend expiration dates or increase our liability, exposure or risk except with our written consent,

   c. Our right to change commissions under Section 10.4 of this termination provision, and

   d. Applicable state laws, in which case this termination provision will be interpreted as necessary to comply.

**SECTION 11: WAIVER.**

Neither you nor we shall be deemed to have waived any right under this Agreement unless such waiver is in writing and signed by you and us. No delay or omission on the part of either you or us in exercising any such right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion.

**SECTION 12: ADVERTISING.**

12.1 **With Company Approval.** You may broadcast, publish and distribute materials referring to us and to our products and services; provided, however, that you shall first secure our written authorization with respect to such materials that were not prepared by us.

12.2 **Authorization for Changes.** With respect to materials which were prepared by us and which refer to us and to our products and services, you shall not alter any such materials, and thereafter broadcast, publish or distribute them as altered without first obtaining our written authorization.

12.3  **Company Intellectual Property.** You shall not employ, reproduce or display our trademark, service mark, logo or other identifying symbols in any manner whatsoever without first obtaining our written authorization.

**SECTION 13: AMENDMENTS.**

We may amend this Agreement at any time by providing you with at least ninety (90) days' advance written notice; provided, however, that no advance notice period is or shall be required for changes, revisions and/or amendments that are necessary to comply with any applicable law or regulation.

**SECTION 14: AUTOMATIC COMPLIANCE.**

If and to the extent that any provision of this Agreement, any Schedule, or any Addendum or Amendment to this Agreement is or becomes in conflict with any applicable federal statute(s) or regulation(s), or those of the state in which you are located, such provision shall be deemed to be amended to conform to those statutes or regulations.

**SECTION 15: ASSIGNMENT AND SEVERABILITY.**

This Agreement shall not be assigned or otherwise transferred by you, in whole or in part, to any person or entity without our prior written authorization. If any provision of this Agreement is held to be invalid, illegal or unenforceable, that action shall not affect or impair, in any way, the validity, legality or enforceability of the remainder of this Agreement.

**SECTION 16: COMPLETE AND EXCLUSIVE AGREEMENT.**

This Agreement supercedes any and all previous agreements between you and us with respect to the subject matter hereof, whether written or oral, and represents the complete and exclusive agreement between us, as to the subject matter hereof. Any and all previous agreements between us with respect to the subject matter hereof, including but not limited to previous agency or brokerage agreements, if any, are hereby terminated as of the effective date hereof.

**SECTION 17: SCHEDULES AND ADDENDA.**

To the extent that any Schedule, Addendum or Amendment attached hereto or hereafter attached, changes, modifies or supercedes any of the terms of this Agreement, the provisions contained in that Schedule, Addendum or Amendment shall control.

**SECTION 18: NOTICES.**

All notices, claims or demands required or permitted to be given hereunder shall be in writing and shall be delivered by hand, or mailed (properly addressed and postage prepaid, either by certified or registered mail with return receipt requested or by first class mail), or by overnight courier which provides written evidence of receipt, or by telecopy with confirming copy by first class mail mailed on the same day as the telecopy was transmitted. All such notices shall be delivered to you at the most current address provided by you. Notices to us shall be delivered to our address specified in writing to you from time to time. Notices delivered by hand or telecopy shall be deemed delivered when received by the addressee. Notices mailed (by the United States mail or by overnight courier) shall be deemed delivered when mailed. Telecopy notices shall be deemed delivered upon confirmation of transmission to the telecopy number provided by the addressee.

**SECTION 19: HEADINGS.**

Headings and/or captions contained in this Agreement are for convenient reference only and do not constitute part of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their authorized representatives.

For the Agent:

By: Del Roberson

Title: President Owner

Date: 1-23-07

For the Company:

By: Robin Nicks

Title: Regional President

Date: 2/26/07